201 N.J. Super. 565 (1985)
493 A.2d 623
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
SENEN MEDINA, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued May 20, 1985.
Decided June 11, 1985.
*568 Before Judges MORTON I. GREENBERG, O'BRIEN and GAYNOR.
Harry G. Parkin argued the cause for appellant.
Catherine A. Foddai, Deputy Attorney General, argued the cause for respondent (Irwin I. Kimmelman, Attorney General, attorney; Catherine A. Foddai, of counsel and on the brief).
The opinion of the court was delivered by MORTON I. GREENBERG, P.J.A.D.
*569 This matter comes on before this court on appeal from defendant Senen Medina's conviction at a jury trial of certain narcotics offenses. Following an investigation in which Leroy Ellis, a convicted criminal, cooperated with the State, a six-count indictment was returned on January 8, 1982 against defendant charging him with: possession of a controlled dangerous substance, cocaine, contrary to N.J.S.A. 24:21-20a(1) (counts one and four); possession of a controlled dangerous substance, cocaine, with intent to distribute contrary to N.J.S.A. 24:21-19a(1) (counts two and five) and distribution of a controlled dangerous substance, cocaine, contrary to N.J.S.A. 24:21-19a(1) (counts three and six). The indictment concerned two incidents on September 22 and September 23, 1981 when defendant sold cocaine to Ellis in Trenton. The principal issue on this appeal relates to defendant's claim that Ellis had supplied this cocaine to defendant and had thus entrapped him.
There were significant pretrial proceedings. At a plenary hearing the court on the State's motion disqualified defendant's attorney, Robert A. Farkas, from representing him because Farkas was an assistant Mercer County prosecutor during the investigation of defendant and had some knowledge of the case from that time. Further, prior to the trial the State moved to quash subpoenas served at defendant's request upon Mercer County Prosecutor Philip S. Carchman and Clair Calandra, a former assistant prosecutor. The judge granted this motion because he saw no indication that either had relevant testimony to offer. At the ensuing jury trial defendant was found guilty on all counts of the indictment.
Defendant was sentenced to an aggregate term of 30 years imprisonment with a 15-year period of parole ineligibility broken down as follows. On count one defendant was sentenced to five years imprisonment to be concurrent with the sentence on count three. The conviction on count two was merged into the conviction on count three and on count three defendant was *570 sentenced to 12 years imprisonment with a six-year period of parole ineligibility. On count four defendant was sentenced to five years imprisonment to run concurrently with the sentence on count six. The judge merged the conviction on count five into the conviction on count six and on count six defendant was sentenced to 18 years imprisonment with a nine-year parole ineligibility, consecutive to the sentence on count three. Four separate penalties of $25 for the use of the Violent Crimes Compensation Board were assessed. This appeal followed.
The case against defendant was developed as an outgrowth of Ellis' indictment in early 1981 for a drug offense. Ellis engaged in negotiations with representatives of the State, including Lieutenant Stephen Agocs of the Mercer County Prosecutor's office. These negotiations resulted in an agreement for him to cooperate in the investigation of other cases. It was contemplated that Ellis would be wired with equipment to record his conversations with suspects under police investigation.
The plan came to fruition. In May 1981 the Mercer County Prosecutor's office asked Ellis to assist in an investigation of defendant. According to Ellis, early on September 22, 1981 while he was working at an organization called United Progress in Trenton he met with defendant who told him if he wanted "some" he had "better catch up with him quick." Ellis knew that defendant was referring to cocaine because he had talked to Ellis about cocaine two to three weeks previously. Ellis and defendant agreed to meet at defendant's house at 11:00 a.m. on the same day.
Ellis testified that following his conversation with defendant at United Progress he attempted to contact Donald Hunt of the Trenton Police Drug Enforcement Unit but since he could not reach him he telephoned Agocs and told him of the projected 11:00 a.m. meeting. Agocs instructed Ellis to meet him at the Mercer County Administration Building parking lot on South Broad Street in Trenton at 10:30 a.m. At approximately 9:30 *571 a.m. on September 22, 1981 Agocs called Investigator Quinton Collins of the Mercer County Prosecutor's office, Special Investigations Unit, and told him about Ellis' telephone call. Agocs told Collins to prepare a consensual interception form so that the prosecutor could authorize interception of Ellis' oral communications. Once the authorization was received and a plan formulated, Collins and Investigator Esther Fausti of the prosecutor's Special Investigations Unit met Ellis at the parking lot at the administration building.
Ellis was given money to use for purchasing the cocaine from defendant. After Collins searched Ellis and the van for drugs, he affixed the transmitting and recording equipment to Ellis' body and taped down the switches so they would not be accidentally turned off once activated. Collins then told Ellis when making the purchase to remain in his seat, not to get out of the vehicle and not to go to the rear of the vehicle. Ellis then went to defendant's home at 554 Centre Street. Collins and Fausti followed in an unmarked vehicle.
Ellis arrived at defendant's home at 11:13 a.m. on September 22, pulling his van to the curb in front of the house. Defendant who was sitting on the porch walked to the passenger side of the van and asked Ellis if he had the money. After Ellis answered affirmatively defendant walked across the street to a silver Ford, reached inside and removed a package of cocaine which he then gave to Ellis. The tapes show that defendant urged Ellis to taste the cocaine which defendant said was good. Indeed defendant indicated he was selling the contraband with a money-back guarantee. Defendant also offered to sell Ellis more cocaine for $475 but said the sale had to take place the next day because he was leaving for Miami. There was not the slightest suggestion in the tape-recorded conversation that the cocaine had originally come from Ellis. Indeed defendant was pushing the sale. Ellis testified that he gave defendant $250 and arranged to meet him the same time the next day.
*572 After completing his purchase Ellis, followed by Collins and Fausti, drove back to the South Broad Street parking lot where Ellis gave Collins the package of cocaine purchased from defendant. Collins then turned off the transmitting and recording devices and removed them from Ellis' body and searched Ellis and the van. He did not find the money given Ellis for the cocaine buy. A field test of the material purchased by Ellis from defendant was positive for cocaine.
According to Ellis on September 23, 1981 he saw defendant changing a flat tire. Ellis told defendant the cocaine he purchased the previous day was "pretty good" and he wanted to get some more. Ellis said defendant told him to come by defendant's house at 11:00 a.m. when his wife would not be home. Ellis subsequently called Agocs and told him about the plan. Ellis was then told to meet members of the prosecutor's staff. Agocs then telephoned Collins and told him Ellis was going to make a second drug buy from defendant. Agocs told Collins again to meet Ellis at the South Broad Street parking lot. This time Collins brought Fausti and three other investigators, Frascella, Byrne and Fredericks to meet Ellis.
The procedure followed a day earlier was repeated. Ellis and the van were searched prior to the buy and Ellis was told how the buy was to "go down." Ellis was given $500 in cash but was told to try to buy the cocaine for $475. Collins, Byrne and Fredericks then went to set up camera equipment to photograph the drug exchange. Frascella and Fausti affixed the recording and transmitting equipment onto Ellis with Fausti taping the switch down so it could not be accidentally switched off. Officers then followed Ellis to defendant's house.
When Ellis pulled up in front of defendant's house, defendant was sitting outside in a red and black Rambler. Defendant got out of the car and approached the driver's side of Ellis' van and asked Ellis if he had the money. Ellis said he had $475 and would owe the other $25 but when defendant complained about this Ellis agreed to pay the $500 which he ultimately did. After *573 Ellis agreed to pay in full defendant went to the trunk of the Rambler, retrieved the package and went back to the driver's side of the van where Ellis was sitting. Defendant then gave Ellis a box containing the cocaine. Ellis left the area and returned to the parking lot followed by the investigators. At the lot Ellis turned over the box containing cocaine to Fausti who gave it to Collins. The recording devices were then removed from Ellis and he and the van were once again searched for cash or contraband, neither of which was found.
A preliminary field test of the narcotics made in the presence of Assistant Prosecutor Robert Farkas was positive for cocaine. Collins showed the test results to Agocs and Farkas. Collins commented that the very dark color was indicative of the quality and strength of narcotics present in the specimen. Farkas was aware of this. According to Agocs and Collins they discussed the case with Farkas. Farkas however denies he had any such conversation. The drugs were eventually tested by the New Jersey State Police and proved positive for cocaine.
Defendant testified and gave a different version of the events. According to defendant Ellis initiated an approach on September 21, 1981 and he and Ellis agreed to meet at defendant's house the following morning. Defendant said that shortly after 9:00 a.m. on September 22 Ellis came to his house and told him that he was having trouble selling cocaine because of a newspaper article reporting an explosion in his laboratory when he was attempting to make cocaine, an event Ellis said had hampered his sales. Defendant said that Ellis asked defendant to transfer cocaine to Ellis in front of a customer so that Ellis could sell the drugs on the pretense they originated with defendant. According to defendant he did not want to get involved but eventually agreed to cooperate with Ellis as a favor. Defendant said that Ellis told him he would have to pretend to sell Ellis the drugs twice. Defendant said he agreed to this sham and that Ellis promised to give him $100 for these services. Defendant said Ellis then gave him two packages of cocaine, one of which he put into his pocket until the first drug *574 retransfer to Ellis at 11:00 a.m. on that day, September 22, and the other of which he retained until the next day.
Defendant admitted passing the cocaine to Ellis. He indicated, however, that he never received any payment from Ellis. Defendant said that the customer of Ellis was in the area on the two occasions when the cocaine was passed but the customer was not available as he had died before the trial.
Matters somewhat tangential to this case were developed at trial. Agocs testified he began having job problems in the Special Investigations Unit in June 1982 when some investigations he had initiated that looked good did not work out. He also said there were personality problems among persons assigned to various investigating functions in the Trenton police and prosecutor's offices. In January 1983 the members of the Special Investigations Unit tested their field kits using cocaine that had been previously analyzed for a closed case. The kits tested negative for narcotics and thus the investigators were concerned that something might have been wrong with the initial analysis of the cocaine or with their field kits. Accordingly the cocaine was resubmitted to the State Police for testing. On March 1, 1983 Agocs was relieved of his duties in the Special Investigations Unit and on May 17, 1983 he was arrested for tampering with narcotics evidence. Agocs subsequently retained Farkas to represent him and pleaded guilty to an accusation arising from the charge.
There were disputes at trial relating to affidavits of Investigator Byrne of the Special Investigations Unit and Hamilton Township Detective Porter, neither of which was supplied to defendant by the State prior to trial in response to defendant's discovery requests. However defendant obtained the Byrne affidavit from another source before the trial and was given the Porter affidavit during the trial. The significance of these affidavits is that they related to Ellis' activities as a substantial drug dealer. These alleged discovery failures led defendant to move for a mistrial, a motion which was denied. Defendant *575 asked that he be supplied the names of informants referred to in the Porter affidavit but the judge would not order this. Further defendant unsuccessfully sought to have the Porter affidavit introduced into evidence.
At the conclusion of the case defendant requested the court charge the jury that the State was required to prove beyond a reasonable doubt Ellis had not supplied the cocaine to defendant. The judge refused this request, though he did charge that if defendant proved entrapment by a preponderance of evidence he had a defense and was entitled to a finding of not guilty. The judge further told the jury that if Ellis had supplied the drugs that was entrapment.
On this appeal defendant raises the following issues:
(1) The burden of proof for a denial of due process is beyond a reasonable doubt.
(2) The defendant was denied his choice of counsel.
(3) The defendant was denied due process when the court quashed the subpoena of Prosecutor Carchman and Assistant Prosecutor Calandra.
(4) The defendant should have been provided with all Brady material.[1]
(5) The defendant should have been provided with the names of the informants.
(6) The defendant should have been permitted to introduce credibility evidence against Jackie Leroy Ellis.
(7) The defendant's sentence was excessive.
Defendant's due process argument is rather intricate. He asserts that prior to the adoption of the New Jersey Code of Criminal Justice, N.J.S.A. 2C:1-1 et seq. (Code), entrapment could be either subjective or objective. Subjective entrapment focused on a defendant's predisposition to commit a crime. Objective entrapment was concerned with guaranteeing that the conduct of the police was consistent with due process and fundamental fairness. Defendant further asserts that when entrapment was raised as a defense the State was obliged to prove beyond a reasonable doubt that the defendant was not *576 entrapped regardless of whether the alleged entrapment was subjective or objective.
Defendant then contends, citing State v. Molnar, 81 N.J. 475 (1980), that the objective entrapment defense was not codified in N.J.S.A. 2C:2-12 which placed the burden of proof on defendant to establish entrapment. He asserts that objective entrapment survives as a defense under N.J.S.A. 2C:2-5 which continues defenses which existed prior to the adoption of the Code if not dealt with in the Code. In defendant's view inasmuch as objective entrapment as a defense exists outside of the Code, the pre-Code rule placing the burden of proof on the State to disprove entrapment should continue notwithstanding the provisions of N.J.S.A. 2C:2-12 placing the burden to establish entrapment on a defendant by the preponderance of the evidence. Finally, defendant urges that under State v. Talbot, 71 N.J. 160 (1976), if a defendant is supplied narcotics by a State agent for the purpose of having the defendant sell the narcotics to someone who is also a State agent, the State's conduct is a denial of fundamental fairness and constitutes entrapment. Thus defendant argues the trial court erred in refusing to charge the State had the burden of proving beyond reasonable doubt that defendant did not receive the cocaine from Ellis, a State agent.
The State disagrees with defendant's analysis. In its view N.J.S.A. 2C:2-12 has superseded prior law with respect to entrapment with a single statutory defense containing both objective and subjective elements. Thus a defendant must establish entrapment as a defense by a preponderance of the evidence to be acquitted on that basis.
We see no error in the charge. While it is true that Molnar gave an indication that objective entrapment as a defense exists outside of the Code (see 81 N.J. at 486) in State v. Rockholt, 96 N.J. 570, 579 (1984) the court stated "... the language and history of N.J.S.A. 2C:2-12 support the view that the Code entrapment provision replaced the prior law of entrapment *577 with a single statutory defense containing both objective and subjective elements." Nevertheless Rockholt did indicate that in addition to the Code's test of entrapment there could be an independent due process/fundamental fairness basis for a defense in a case in which a Code entrapment defense was not established. Id. at 580-581. We hold that a State v. Talbot defense is of a constitutional due process nature and thus exists independently of N.J.S.A. 2C:2-12.
However we see no reason why the burden of proof even when a due process defense is raised should not be on a defendant as specified in N.J.S.A. 2C:2-12. In any entrapment or due process defense case in which the State establishes beyond a reasonable doubt that the defendant committed the elements of the offenses, regardless of the nature of the defense of entrapment or the egregiousness of the State's conduct, the defendant is seeking to avoid the consequences of his otherwise unlawful conduct. Thus while a defendant has a defense under State v. Talbot if a State agent supplies narcotics to him for the purpose of arranging a sale by him to an undercover agent, the burden to establish that this is what happened should be on the defendant by a preponderance of the evidence.
In our view it does not matter whether this result is reached under N.J.S.A. 2C:2-12 or under common or constitutional law. The fact that defendant raises a defense which we consider to be of constitutional rather than statutory origin does not mean that the burden of proof on the issue must be on the State. For example a defendant is required to demonstrate the invalidity of a search based on a warrant issued in accordance with appropriate procedures to obtain an order of suppression of evidence seized in the execution of the warrant. See State v. Valencia, 93 N.J. 126, 133 (1983). Further we point out as noted by the Supreme Court in State v. Rockholt, supra, 96 N.J. at 576 n. 2, the court in State v. Talbot did not indicate who had the burden of proof with respect to objective entrapment *578 or the nature of that burden.[2] Certainly if the issue is open we should follow N.J.S.A. 2C:2-12 in assigning the burden. Finally we note that defendant's position could cause great confusion at a trial for if a defendant raised both statutory entrapment and a due process violation as defenses the jury would have to be given different instructions as to the burden of proof on each.
Here the judge, after pointing out that defendant asserted Ellis had supplied the cocaine, told the jury if that is what happened defendant was entrapped even if the law enforcement officials did not know about it. He also told the jury that if the State had proven each element of the offense beyond a reasonable doubt then the jury should decide whether defendant had established the entrapment by a preponderance of the evidence. If so he was to be found not guilty. Though we have not characterized the defense raised as entrapment, in substance this charge was correct.[3]
Defendant asserts that the court should not have disqualified Farkas from acting as his attorney. While defendant does not deny that Farkas was a Mercer County assistant prosecutor during the events in this case, he argues that any information of which Farkas became aware as an assistant prosecutor was not meaningful to the prosecution. Further defendant contends that inasmuch as he offered to stipulate to the results of the field test made in Farkas' presence and not to cross-examine Collins regarding the test, Farkas' presence during the test should not have caused his disqualification. The *579 State urges that the trial court did not err in disqualifying Farkas because as an assistant prosecutor he was privy to information gathered during the investigation of defendant. Further the State urges that Farkas' representation of defendant created an appearance of impropriety.
The motion judge's findings with respect to Farkas, all fully supported in the record, were that while Farkas did not participate in the investigation of defendant, he did acquire knowledge of it when he was an assistant prosecutor and was present during the field testing of the cocaine obtained from defendant. Further Farkas knew the test showed a very dark and rich color indicative of narcotics. Thus the judge held that even though Farkas did not know the test involved defendant, he came to understand the significance of his knowledge. We hold that inasmuch as Farkas while assistant prosecutor learned of information directly bearing on a critical element of the offense he was properly disqualified. See Ross v. Canino, 93 N.J. 402, 408-409 (1983); In re Advisory Opinion, 77 N.J. 199, 203-205 (1978).
Defendant's stipulations were not sufficient to remove the bar. Clearly the representation by Farkas of defendant in this case gave rise to an appearance of impropriety. We think it evident that any informed and concerned person would consider it improper for a former assistant prosecutor with personal knowledge of facts incriminating his client to assert his innocence. The appearance of impropriety required his disqualification. See Ross v. Canino, supra, 93 N.J. at 409; In re Professional Ethics Opinion 452, 87 N.J. 45, 50 (1981); In re Advisory Opinion, supra, 77 N.J. at 206; State v. Rizzo, 69 N.J. 28, 30 (1975).
We also point out that the record shows that Farkas represented Agocs when he was arrested for tampering with the cocaine evidence. Defendant contends in his brief that Agocs entrapped him in order to make a major narcotics arrest and thereby secure his job with the Special Investigations Unit. *580 Thus defendant charges Agocs with an impropriety. In view of these obvious conflicting interests of defendant and Agocs we cannot understand how a single attorney could represent both.
Defendant's contentions with respect to the quashing of the subpoenas on Prosecutor Carchman and Assistant Prosecutor Calandra relate to Agocs' position in this case. Defendant sought to call these persons as witnesses to show that Agocs had tampered with evidence for a substantial period of time and had entrapped defendant in order to keep his job. Defendant submits that Carchman and Calandra would have testified about the ability and integrity of Agocs during the summer and fall of 1981 when the investigation was being undertaken. Defendant believed these individuals had relevant information because of newspaper accounts quoting them as saying they had problems with the performance and integrity of Agocs. The trial court quashed the subpoenas on the ground the proposed testimony would be irrelevant to defendant's case and would be confusing and misleading to the jury.
We see no error in the quashing of the subpoenas. While the evidence may have had some relevance, the judge properly excluded it on grounds it would be confusing and misleading to the jury. Evid.R. 4 permits the judge in his discretion to exclude evidence if he finds that its probative value is substantially outweighed by the risk that its admission will create substantial danger of undue prejudice or of confusing the issues or of misleading the jury. Of course a party seeking to exclude evidence under Evid.R. 4 has the burden of convincing the court that the factors favoring exclusion substantially outweigh the probative value of the contested evidence. State v. Carter, 91 N.J. 86, 106 (1982). But the more attenuated and the less probative the evidence, the more appropriate it is for a judge to exclude it under Evid.R. 4.
Here the relevance of the evidence to this case is so attenuated that its probative value is slight. Defendant's reason for offering the testimony of Calandra and Carchman was to create *581 an inference that Agocs had a motive to entrap defendant and actually did so. In State v. Wilbely, 122 N.J. Super. 463 (App. Div. 1973), rev'd on other grounds 63 N.J. 420 (1973), the defendant sought to introduce evidence of his financial resources to disprove an intent to steal. We upheld the exclusion of this evidence because of the collateral questions it could raise. 122 N.J. Super. at 466-467. Similarly, testimony that Agocs was having job troubles could raise numerous collateral questions regarding the reason for the problems and efforts to resolve them. Further in any case a police officer might have a motive to entrap a defendant to enhance his own career. Finally we must not lose sight of the fact that this case involved defendant as a party and not Agocs and the jury had direct evidence of what defendant had done. Inasmuch as any value of the excluded testimony was so slight we see no abuse of discretion in the exclusion of the Carchman and Calandra testimony.
The court did not err in refusing to grant a mistrial because of the alleged Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) violation. This issue relates to the Byrne and Porter affidavits which tended to show Ellis' substantial drug involvement. Initially we note defendant had the Byrne affidavit at the outset of the trial and used it extensively on cross-examination of Ellis. Thus we do not see how he could have been injured by not having it earlier. Though defendant did not receive Porter's affidavit until after his cross-examination of Ellis the delay did not give rise to reversible error. The Porter affidavit included cumulative impeachment evidence that Ellis had been involved in cocaine trafficking in 1980 and thus could have properly been limited by the trial court. See DiNizio v. Burzynski, 81 N.J. Super. 267, 274 (App.Div. 1963). In any event it was abundantly demonstrated at the trial that Ellis was involved in the drug traffic and was a disreputable person. Indeed he admitted to being a liar, con man and pill dealer. Further he said he had distributed drugs and had been charged with and convicted of atrocious assault and battery because he "shot a guy." He also said he *582 had spent time in prison. In addition defendant called Peter Larson as a witness who testified Ellis was a major cocaine dealer in 1980. It is difficult to imagine how a witness could have appeared in a worse light than Ellis. Yet the fact is that the clear circumstances showed that Ellis was being truthful with respect to his dealings with defendant. Indeed the record makes it quite plain that defendant's contentions regarding the source of the cocaine were a patent sham. Otherwise defendant's effort to satisfy Ellis as to the quality of the cocaine were farcical. Further while defendant denied receiving payments from Ellis the testimony was clear that Ellis received the money before he went to see defendant and did not have it after their transactions. We also note that defendant's credibility was impeached when evidence of his narcotics convictions was developed on the cross-examination of him.
The court did not err in refusing to require that defendant be told the names of the informants in the Porter affidavit so he could call them to impeach the credibility of Ellis. Under Evid.R. 36 the identity of a State informant should be withheld unless the judge finds it has already been otherwise disclosed or its disclosure is essential to assure a fair determination of the issues. Here the informants had information concerning Ellis and their names were sought so defendant could get that information. Thus the information sought did not directly relate to this case which accordingly should be contrasted with Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), cited by defendant. In Roviaro the informer whose identity was sought by the defendant had helped set up the commission of the crime and was present when it was committed. Here disclosure of the informants would only have revealed testimony to impeach Ellis by establishing that he was a major cocaine dealer and not just a small-time pill dealer and would have had no direct bearing on defendant's claim of entrapment. Defendant's alleged need for this collateral information surely did not outweigh the State's interest in maintaining the flow of information to it from confidential sources. The *583 judge did not abuse his discretion in denying disclosure. See State v. Milligan, 71 N.J. 373, 384 (1976).
We see no merit in defendant's contention that he was improperly precluded from introducing evidence impeaching Ellis' credibility, a claim relating to the refusal of the court to allow defendant to introduce the Porter affidavit into evidence. This point does not require extended discussion. There is, as we have already pointed out, no question but that Ellis was thoroughly impeached. Yet the jury either believed him in spite of the type of person he clearly was or convicted defendant because the circumstances of the case could not reasonably have allowed any other result. We are satisfied that no matter what else had been demonstrated about Ellis, defendant would have been convicted.
Defendant's contention that the sentence was excessive is clearly without merit. R. 2:11-3(e)(2).
Affirmed.
NOTES
[1] Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
[2] We recognize that the court may have been referring to the burden to establish the legal consequence of acts rather than to prove facts.
[3] In State v. Talbot, supra, 71 N.J. at 168-169, the court indicated that the determination of whether police activity had overstepped the bounds of permissible conduct is to be decided by the judge rather than the jury. However in view of the remand for a new trial because of the factual uncertainties in the case, it is evident that the question for the court was the legal significance of the police conduct and not the determination of what that conduct was.