589 A.2d 1382

STATE OF NEW JERSEY, PLAINTIFF, v. ALEX FLOREZ AND HAROLD GARCIA, DEFENDANTS.

Superior Court of New Jersey
Law Division Somerset County

Decided March 12, 1991.

*James R. Wronko* for plaintiff (*Nicholas L. Bissell, Jr.,* Prosecutor of Somerset County, attorney).

*Anthony J. Mignella* for defendant Alex Florez (*William J. Bizub,* Deputy Public Defender of Somerset County, attorney).

*William O. Perkins, Jr.* for defendant Harold Garcia (*Perkins & Medal,* attorneys).

IMBRIANI, P.J.Cr.

The issue in this case is whether the State should be compelled to disclose the true name and address of a confidential informant. The State acknowledges that his testimony at the trial is essential to a fair determination of the issues. Consequently, he had been identified as a Nicholas Cappolo, but the State now concedes that although he has used this name for several years it is in fact a pseudonym.

This case involved a "reverse sting" in which the police posed, not as buyers of cocaine as usually occurs, but as sellers. The purpose of the operation is to identify and arrest mid-level cocaine dealers in the New York metropolitan area who seek to purchase large quantities of cocaine at wholesale prices. These dealers, who are known to distribute cocaine throughout the entire New York metropolitan area, including Somerset County,

generally do not reside in Somerset County and, in this case, reside in Union County.

About one and one-half years ago, the Somerset County Prosecutor's Office hired Nicholas Cappolo as a confidential informant (hereafter CI) and instructed him to disseminate information, in the New York metropolitan area, that he knows a person who will sell large quantities of cocaine at less than usual wholesale prices. The usual price was $18,000 to $22,000 per kilogram of cocaine, but he said that this seller was willing to accept only $16,000 per kilogram [1]. CI's responsibility was to arrange a meeting at which the buyers would bring cash to a predetermined location to purchase cocaine from an undercover police agent and at that time the buyers would be arrested.

The State agreed that, if the services of CI resulted in an arrest, he would receive a fee for his services of 10% of all cash seized up to $100,000, and 15% in excess of $100,000. CI has been enormously successful. As the result of his efforts 13 indictments have been returned against 27 defendants and cash of about $1,300,000, generally in $5, $10, $20 and $100 bills, has been seized. Consequently, CI has earned over $130,000.

CI met defendants in Elizabeth, New Jersey, and following discussions in Union and Hudson Counties, they agreed to go to the parking area of a shopping mall in Somerset County to complete the transaction. Defendants expressed a desire to buy multi-kilograms of cocaine, but as a starter the first transaction was to be for only one kilogram at a price of $16,000.

During the morning of January 6, 1990 defendants, CI and a fourth person (another confidential informant for the State) met in Elizabeth, New Jersey, went to a diner for breakfast and agreed to meet early that afternoon at the shopping mall.

---

[1] The State's drug expert testified that when diluted and sold to street users a dealer would realize about $90,000 per kilogram. Thus, with a $16,000 investment a gross profit of $74,000 could be earned.

Defendants went separately in their car and CI and the other person in a second car. Defendants were instructed by CI to bring $16,000 in cash and CI, who did not then possess the cocaine for security reasons, agreed to produce the cocaine at the shopping mall. Pursuant to a pre-determined plan prosecutor's detectives parked a decoy automobile (a third car) in the parking area at the mall and placed one kilogram of cocaine in a bowling bag in the trunk.

Upon arrival at the mall one defendant remained in his car as a look-out while the other went to the decoy car with a bag containing $16,000 in cash which he placed on the front seat of the decoy car. CI had exited his car and was waiting for defendant in the decoy car. When CI received the money he told defendant to open the trunk of the decoy car and remove the bowling bag which contained the cocaine. Defendant returned to his car with the cocaine but before defendants could leave the area a surveillance team of about ten police officers converged on the scene, seized the cocaine and $16,000, arrested both defendants and charged them with conspiracy to possess cocaine with intent to distribute.

The State previously made a motion to permit CI to testify at the trial with a hood over his head to conceal his identity in order to protect him and his family. The motion was denied as a violation of defendants' Sixth Amendment right to confront all witnesses against them. *See Coy v. Iowa,* 487 *U.S.* 1012, 108 *S.Ct.* 2798, 101 *L.Ed.*2d 857 (1988) and *Maryland v. Craig,* —— *U.S.* ——, 110 *S.Ct.* 3157, 111 *L.Ed.*2d 666 (1990). The court also denied defendants' motion to dismiss the indictment for alleged "due process" entrapment which was based on the claim that (1) CI was paid a commission and (2) the State supplied the drugs. Both claims were held to be without merit. *See State v. Talbot,* 71 *N.J.* 160, 364 *A.*2d 9 (1976); *State v. Rockholt,* 96 *N.J.* 570, 476 *A.*2d 1236 (1984); *State v. Medina,* 201 *N.J.Super.* 565, 493 *A.*2d 623 (App.Div.1985).

 This is another motion filed by defendants to obtain the true name of CI and his residence so that they can inquire into his background and attempt to interview him. They also sought a copy of his FBI arrest record and when the State objected, the court ordered that it be submitted *in camera*. It was at that time that it was first revealed that "Nicholas Cappolo" was a pseudonym. The court gave defendants a copy of the arrest record with CI's true name redacted and informed defendants that "Nicholas Cappolo" was not CI's true name. The arrest record revealed that CI was arrested in Seattle, Washington in 1983 upon a charge of sale of cocaine that was dismissed and again on March 30, 1990 (two months after this incident) by federal authorities in Brooklyn, New York upon a charge of theft of government funds, which charge is still pending.

 It is well established that the identity of a confidential informant need not be disclosed unless his identity is essential to assure a fair determination of the issues. *See Evid.R.* 36; *Roviaro v. U.S.*, 353 *U.S.* 53, 77 *S.Ct.* 623, 1 *L.Ed.*2d 639 (1957); *State v. Oliver*, 50 *N.J.* 39, 231 *A.*2d 805 (1967). The policy objective is to foster effective law enforcement by encouraging citizens to perform their civic duty to communicate knowledge of criminal activity to law enforcement officials. The foundation of the policy is that citizens will be encouraged to perform that obligation if they can be assured of their anonymity. However, the privilege is not absolute and is inapplicable when the confidential informant is an essential witness, or was an active participant in the crime, or the defense of entrapment seems reasonably plausible or mandated by fundamental principles of fairness to the accused. *State v. Milligan*, 71 *N.J.* 373, 383–384, 365 *A.*2d 914 (1976). The issue here is not whether there shall be disclosure but what shall be its extent.

Defendants argue that they need the true name and address of CI to inquire into his background to obtain information to effectively cross-examine him. For instance, they contend that

they need to investigate the circumstances of his two arrests but they cannot do so unless they are told his true name and can go to the courthouse where he was arrested to examine his file. Our task is to balance defendants' need to obtain relevant information to assist in the cross-examination of CI against the State's need to protect the anonymity of confidential informants who are said to be the cornerstone of the war on drugs. We must deal with many intangible factors and it is not easy to discern the components of this equation, much less its solution. We are satisfied that the need of the State is clear and substantial. What we must also determine is whether the need of defendants is equally clear and substantial. Is this information essential to enable defendants to fully and vigorously defend themselves? *Roviaro* recognized that no fixed rule respecting disclosure can be enunciated and each case must be examined separately. 353 *U.S.* at 62, 77 *S.Ct.* at 628, 1 *L.Ed.*2d at 646.

The State contends that receipt of CI's true name and address will not provide defendants with anything meaningful, but will only intimidate CI and place him and his family in grave danger of death. We now recognize that tightly knit organizations exist in the United States to distribute cocaine and to avoid detection and penetration by police undercover agents. Membership in the group is frequently restricted to persons from a particular country who not only speak the same foreign language but who also have family members still residing in that foreign country. Those family members could constitute hostages who will be exposed to injury or death should a relative cooperate with the police. Consequently, the State contends that to induce someone to serve as a confidential informant and penetrate an organized cocaine distribution group not only must he be offered a substantial financial reward, but to protect his family still residing in a foreign country, his identity must remain confidential.

Many times when disclosure of a confidential informant is essential the State will provide protection to him and his family,

including placing him in a federal witness protection program. However, crimes that reach into a foreign country, which frequently occur in cases dealing with the illegal distribution of drugs, present unique problems because the State is unable to provide protection to the family members who reside in a foreign country.

We are not dealing with the usual confidential informant case in which a private citizen serves the State in the discharge of his civic duty, or of a person who has been charged with a crime who works with the police to obtain a favorable sentencing recommendation. Here we are dealing with a paid, professional, confidential informer who at great personal risk agreed for financial rewards to penetrate a highly organized international cocaine distribution ring which is recognized to be violent and dangerous, especially against members of the group who turn state's evidence. We know this not only because it is general knowledge throughout society but because CI, in a certification submitted *in camera* to the court, a copy of which was given to defendants, again with his name redacted, said:

> a. If my name, address or facial appearance were disclosed to anybody my life would be placed in grave jeopardy. Additionally, disclosure of this information would place my family in grave danger.
>
> b. Contracts have been issued upon my life by major drug organizations, including the Medellin and Cali cartels in Columbia because of my activities on behalf of the Somerset County Prosecutor's Office during the past one and one-half years.

The court appreciates the danger to which CI could be exposed by having to reveal his facial appearance to defendants and their friends. However, as previously stated, constitutional proscriptions prohibit its avoidance.

No one contends that defendants are leaders or senior members of the cocaine distribution organization. But that they are important members of such an organization is clear. Some 34 years ago, Justice Clark said in his dissent in *Roviaro:*

> it is well to remember that the illegal traffic in narcotic drugs ... is a most difficult crime to detect and prove ... [e]nforcement is, therefore, most difficult

without the use of "stool pigeons" or informants. [353 *U.S.* at 66, 77 *S.Ct.* at 630–631 (Clark, J. dissenting)]

If this was true in 1957, it is much more so today.

Although as a general rule, a defendant is permitted to present to the jury "any fact which bears against the credibility of a witness," *State v. Pontery*, 19 *N.J.* 457, 472, 117 *A.2d* 473 (1955), he is not entitled to unlimited discovery under the guise that it is indispensible to obtain evidence to impeach credibility. Thus, although generally the surveillance site used by a police officer should be disclosed, when that information will reveal the name of the confidential informant because his apartment was used as the surveillance site, the information need not be disclosed because:

disclosing the surveillance site would be only of peripheral assistance to [defendant]. It is difficult to imagine what use, if any, [defendant] can make of the exact surveillance site. [*State v. Williams*, 239 *N.J.Super.* 620, 634, 571 *A.2d* 1358 (App.Div.1990)]

Thus, what we must do is weigh defendants' constitutional right to conduct effective cross-examination against a determination of whether disclosure will imperil the use of confidential informants. As said in *State v. Crudup*, 176 *N.J.Super.* 215, 219, 422 *A.2d* 790 (App.Div.1980), we must be careful not to seriously impair an important law enforcement investigative technique when disclosure would render its future use valueless and expose a confidential informant to reprisal and death.

Why is disclosure of CI's name and address so necessary? The need asserted is to acquire information to impeach his credibility. But is it really necessary? Let us examine what information defendants already have to impeach the credibility of CI.

1. CI refuses to disclose his true name and for several years has used a pseudonym.

2. CI refuses to disclose his true residence and defendants are unable to go to his neighborhood to question him or inquire into his background.

3. CI is not performing a civic duty as a good citizen but is working for money and, indeed, has already realized substantial financial rewards.

4. CI has a pending criminal charge in New York of "Theft of Government Funds" and, not only does this make him a witness not worthy of credibility,

but his testimony is tainted by his hope or expectation that the Somerset Prosecutor's Office will recommend consideration or leniency on his behalf to the New York authorities.

5. Without CI's true name defendants cannot go to the courthouse in Brooklyn where he was arrested to examine the full record of his arrest.

How much more do the defendants need to impeach his credibility? Is there ever enough? What more could be added by providing defendants with the true name and address of CI?

The suggestion that defendants need the true name and address of CI to enable defendants' investigators to inquire into his background is without merit. This information is neither relevant nor admissible. His credibility can be impeached only by evidence of his prior conviction of crime (there are none) or, as exists here, by showing that he has a pending criminal charge and his testimony could be tainted by his hope or expectation of a favorable recommendation from this prosecutor. Defendants already have this information. One does not have to be a "rocket scientist" to appreciate that knowledge of CI's true name and address will be of only "peripheral assistance" to defendants and is more apt to frighten and terrorize CI and his family into believing that their lives will be in jeopardy if CI continues to cooperate with the State.

A balancing of all the factors compels the conclusion that the necessity for nondisclosure of CI's true name and address far outweighs the necessity for disclosure. Consequently, defendants' motion for disclosure of CI's name and address, as well as for an unredacted copy of his arrest record, is denied.