636 A.2d 1040

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT AND
CROSS–RESPONDENT, v. ALEX FLOREZ, DEFENDANT–
RESPONDENT AND CROSS–APPELLANT.

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. HAROLD GARCIA, DEFENDANT–APPELLANT.

Argued September 28, 1993—Decided January 27, 1994.

*Craig V. Zwillman* argued the cause for appellant and respondent, State of New Jersey (*Fred DeVesa,* Acting Attorney General of New Jersey).

*Stephen W. Kirsch,* Assistant Deputy Public Defender, argued the cause for appellant Harold Garcia (*Zulima V. Farber,* Public Defender, attorney).

*Jay L. Wilensky,* Assistant Deputy Public Defender, argued the cause for respondent Alex Florez (*Zulima V. Farber,* Public Defender, attorney).

The opinion of the Court was delivered by

HANDLER, J.

Defendants were arrested as a result of their purchase of one kilogram of cocaine from a paid informant, who, with the participation of another informant, helped to negotiate and consummate the drug sale and was the State's primary witness. Following a jury trial, they were convicted for the drug offense. This case raises the issue of whether the State was required to disclose the true identity of the paid informant. The role of the informants also poses the issue of whether, under the circumstances, defendants were entrapped as a matter of due process. That issue bears on the additional issue of whether the State violated defendants' right to discovery by failing to disclose the fact that the

other participant in the drug sale was also an informant. The final issue is whether the trial court's failure to instruct the jury on the weight of the cocaine as a necessary element of the underlying offense of possession with intent to distribute constituted error.

After their arrests for the attempted purchase of cocaine, defendants, Alex Florez and Harold Garcia, were indicted for conspiracy to commit the crime of possession of a controlled dangerous substance with intent to distribute, contrary to *N.J.S.A.* 2C:35–5a(1), b(1), and *N.J.S.A.* 2C:5–2, and conspiracy to commit the crime of distribution of a controlled dangerous substance, contrary to *N.J.S.A.* 2C:35–5a(1), b(1), and *N.J.S.A.* 2C:5–2. Garcia was also charged with resisting arrest, contrary to *N.J.S.A.* 2C:29–2. The trial court later dismissed the charges of conspiracy to commit the crime of distribution of a controlled dangerous substance as redundant.

Before trial, defendants brought motions to require the State to disclose the true identity of the primary informant as well as to furnish an unredacted report of his criminal record. The court denied those motions. 248 *N.J.Super.* 54, 589 *A.2d* 1382 (Law Div.1991). A jury convicted defendants of second-degree conspiracy to possess cocaine with intent to distribute, contrary to *N.J.S.A.* 2C:35–5a(1), b(1), and *N.J.S.A.* 2C:5–2. Defendants then renewed earlier motions for judgments of acquittal and also moved for a new trial, all of which the court denied. The court thereafter sentenced defendants to eight years in prison and imposed fines.

Defendant Florez appealed his conviction to the Appellate Division. That court ruled that the conviction must be reversed on the ground that the State should have been required to disclose the principal informant's true identity, and further indicated that defendants' discovery rights had been violated and that the trial court had not properly resolved the entrapment defense. 261 *N.J.Super.* 12, 617 *A.2d* 670 (1992).

This Court granted the State's petition for certification, 133 *N.J.* 442, 627 *A.2d* 1147 (1993), and also granted a motion for direct

certification filed by Garcia, 134 *N.J.* 474, 634 *A.*2d 522 (1993). During the pendency of the appeal, Florez filed a cross-petition for certification, which the Court now grants, *nunc pro tunc.*

## I

The important facts are described fully in the opinion of the trial court, denying defendants' pretrial motions to learn the true identity of the principal informant, 248 *N.J.Super.* at 56–58, 589 *A.*2d 1382, and in the opinion of the Appellate Division, reversing Florez's conviction, 261 *N.J.Super.* at 16–19, 617 *A.*2d 670.

The trial court explained the prosecutor's use of the paid informant:

> This case involved a "reverse sting" in which the police posed, not as buyers of cocaine as usually occurs, but as sellers. The purpose of the operation is to identify and arrest mid-level cocaine dealers in the New York metropolitan area who seek to purchase large quantities of cocaine at wholesale prices. These dealers, who are known to distribute cocaine throughout the entire New York metropolitan area, including Somerset County, generally do not reside in Somerset County and, in this case, reside in Union County.
>
> About one and one-half years ago, the Somerset County Prosecutor's Office hired Nicholas Capolo as a confidential informant (hereafter CI) and instructed him to disseminate information, in the New York metropolitan area, that he knows a person who will sell large quantities of cocaine at less than usual wholesale prices. The usual price was $18,000 to $22,000 per kilogram of cocaine, but he said that this seller was willing to accept only $16,000 per kilogram. CI's responsibility was to arrange a meeting at which the buyers would bring cash to a predetermined location to purchase cocaine from an undercover police agent and at that time the buyers would be arrested.

> [248 *N.J.Super.* at 56–57, 589 *A.*2d 1382 (footnote omitted).]

In addition, the trial court noted how the informant was paid:

> The State agreed that, if the services of CI resulted in an arrest, he would receive a fee for his services of 10% of all cash seized up to $100,000, and 15% in excess of $100,000. CI has been enormously successful. As the result of his efforts 13 indictments have been returned against 27 defendants and cash of about $1,300,000, generally in $5, $10, $20 and $100 bills, has been seized. Consequently, CI has earned over $130,000.

> [*Id.* at 57, 589 *A.*2d 1382.]

The Appellate Division described the involvement of the informants in the commission of the specific crimes that were charged against defendants:

> On January 2, 1990, Orizon De La Roche also became an informer for the Somerset County Prosecutor following his arrest during a drug transaction arranged by Capola.[1] He was not a paid informer; instead he worked as an informant in the hope of receiving a favorable disposition of his criminal case. On January 4, 1990, De La Roche provided Capola with the names of defendant Florez and co-defendant Garcia as potential cocaine buyers. The first meeting between defendant, Garcia, De La Roche and Capola occurred on January 6, 1990 in Elizabeth, New Jersey. This meeting was the outcome of other discussions about the sale and purchase of one kilogram of cocaine for $16,000.
>
> At the meeting, defendant approached a car, which Capola and De La Roche occupied, while Garcia remained about 200 feet away in the defendant's car. Capola and defendant discussed the one kilogram of cocaine. After that conversation, Garcia and Florez drove to a diner in Roselle, New Jersey, where the two of them, Capola and De La Roche had coffee. They agreed that after breakfast, Garcia and Florez would follow Capola and De La Roche to a certain area of the parking lot for the Blue Star Shopping Center in Watchung, Somerset County, New Jersey, to finalize the sale for one kilogram of cocaine for $16,000.
>
> When Capola and De La Roche arrived at the parking lot, Capola got out of his car leaving De La Roche behind. Pursuant to a predetermined plan, a surveillance team of regular law enforcement personnel had parked a decoy automobile (a third car) in the designated parking area at the mall into which they had placed one kilogram of cocaine in the trunk. Capola walked from his car to the decoy car with Florez. Garcia followed in their car and parked next to the decoy car. After Garcia showed Capola the money, they got into the decoy car. The money ($16,000) was given to Capola by Garcia. Capola then obtained the cocaine from the trunk of the decoy car, and it was placed into a gym bag. Garcia took possession of the cocaine, while Florez was standing beside the decoy car. Garcia told Capola that the money bag contained one of two checks which were good. As Garcia and Florez were walking back to their car, the surveillance team of law enforcement officers arrested everyone and seized the cocaine as well as the money. Later, Capola was paid about $1,700 in commissions for this drug deal.

[261 *N.J.Super.* at 17–19, 617 *A.*2d 670.]

From those accounts, Copola clearly was a regularly-used informant who had established a continuing relationship with law-

---

[1] The spelling of Copola's name appears in several variations throughout the proceedings including Copola, Capola and Cappola. The informant is hereafter referred to as "Copola."

enforcement authorities and was highly paid on a contingent basis depending on his success in getting persons to commit drug crimes, specifically, the illegal purchase of large quantities of drugs for substantial sums of money. That he played a central and critical part in the commission of the crimes allegedly committed by defendants is also clear.

## II

Whether the State should have disclosed Copola's true identity to defendants is governed by the informant's privilege. *Evidence Rule* 36 (now *Evidence Rule* 516) provides that a witness need not provide the identity of an informant unless the identity of that person has already been otherwise disclosed or "disclosure of his identity is essential to assure a fair determination of the issues."

This Court explained the importance of the privilege in *State v. Oliver*, 50 *N.J.* 39, 42, 231 *A.*2d 805 (1967):

> The privilege exists to secure a flow of vital information which can be had only upon a confidential basis. Not all such information comes from people of high motivation. The police must have the aid of men of lesser quality who respond to selfish inducements, including money. These men are needed for what they know, but also for what they can learn because of their associations. This is especially true with respect to crimes of a consensual nature as to which there is little likelihood that a victim will complain. [Citations omitted.] The informer paid or not, is subject to risks of retaliation which a regular member of a police force need not fear and hence, whether paid or not, he comes within the protection of the privilege.

However, the informant's privilege is not absolute. As the United States Supreme Court has stated:

> Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way. In these situations the trial court may require disclosure and, if the Government withholds the information, dismiss the action.

> [*Roviaro v. United States*, 353 *U.S.* 53, 60–61, 77 *S.Ct.* 623, 628, 1 *L.Ed.*2d 639, 645 (1957) (footnote omitted).]

Without a strong showing of need, courts will generally deny a request for disclosure. Thus, in *State v. Milligan*, 71 *N.J.* 373,

388–89, 365 *A.2d* 914 (1976), the Court refused to require the disclosure of the identity of an informer who had merely introduced the undercover agent to the defendant but had not participated in the criminal transaction itself, although he had been present. *See Oliver, supra,* 50 *N.J.* at 42, 231 *A.2d* 805 (finding no need to disclose informer's identity where informer played no part in criminal act, State had not attempted to introduce informer's information into record, and defense was unable to prove that informer's testimony was necessary for a fair determination of issues); *State v. Varona,* 242 *N.J.Super.* 474, 480, 577 *A.2d* 524 (App.Div.) (holding no need to disclose true identity of informer, who merely introduced defendant to undercover officers and only witnessed criminal transaction, but did not participate in crime), *certif. denied,* 122 *N.J.* 386, 585 *A.2d* 389 (1990).

On the other hand, as the Court recognized in *Milligan, supra,* the State cannot invoke the privilege when the informer is an essential witness on a basic issue in the case, when the informer is an active participant in the crime for which the defendant is on trial, when the defendant may reasonably assert the defense of entrapment, or when fundamental principles of fairness to the accused mandate disclosure. 71 *N.J.* at 383–84, 365 *A.2d* 914.

In determining whether the State must disclose the true identity of an informant, courts weigh and balance the competing considerations on a case-by-case basis. *Id.* at 384, 365 *A.2d* 914; *see McCray v. Illinois,* 386 *U.S.* 300, 311, 87 *S.Ct.* 1056, 1062, 18 *L.Ed.*2d 62, 70, *reh'g denied,* 386 *U.S.* 1042, 87 *S.Ct.* 1474, 18 *L.Ed.*2d 616 (1967). As explained by the Supreme Court in *Roviaro, supra:*

> We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors.

[353 *U.S.* at 62, 77 *S.Ct.* at 628–29, 1 *L.Ed.*2d at 646.]

█ Under the criteria set forth in *Milligan, supra,* the relevant factors in this case unquestionably demand the disclosure of the informant's identity. 71 *N.J.* at 383–84, 365 *A.*2d 914. Copola was an active participant in the crime. He was also the key witness on basic issues in the case. Further, defendants urged the defense of entrapment based in large measure on Copola's status as an agent of the State and on his role in the commission of the crime. As the Appellate Division noted, "where the informer was an active participant in the criminal event and has testified for the State as its principal witness, the balancing of the defendant's need for disclosure against the public interest in protecting the flow of information ... should generally result in disclosure." 261 *N.J.Super.* at 24–25, 617 *A.*2d 670. The United States Supreme Court found reversible error when a trial court allowed the government to withhold the identity of an informer who was the sole participant along with the defendants in the drug transaction charged, who might have been a material witness, and who was the only witness in the position to support or refute the testimony of the governmental witness. *Roviaro, supra,* 353 *U.S.* at 63–65, 77 *S.Ct.* at 629–30, 1 *L.Ed.*2d at 647.

The trial court, nevertheless, believed that disclosure of the informant's true name and address was not necessary because defense counsel was otherwise able to conduct an independent investigation and undertake an effective cross-examination of the informant. 248 *N.J.Super.* at 62–63, 589 *A.*2d 1382. The prosecutor had provided a redacted copy of Copola's arrest record, which revealed that he had been arrested in Seattle on drug charges, which were later dismissed, and that federal authorities had arrested him in March 1990 for theft of government funds (a charge that was still pending at the time of trial). The trial court felt that that information was sufficient for defense purposes. It reasoned "that knowledge of [the informant's] true name and address will be of only 'peripheral assistance' to defendants." *Id.* at 63, 589 *A.*2d 1382.

The United States Supreme Court, overturning a conviction in a case in which the defendant had been prevented from asking the principal prosecution witness either his name or address, held that when credibility is at issue, the starting point "in 'exposing falsehood and bringing out the truth' " is the name and address of the informer because they "open countless avenues of in-court examination and out-of-court investigation." *Smith v. Illinois,* 390 *U.S.* 129, 131, 88 *S.Ct.* 748, 750, 19 *L.Ed.*2d 956, 959 (1968) (quoting *Pointer v. Texas,* 380 *U.S.* 400, 404, 85 *S.Ct.* 1065, 1068, 13 *L.Ed.*2d 923, 926 (1965)). Further, the Court stated, "[t]o forbid this most rudimentary inquiry at the threshold is effectively to emasculate the right of cross-examination itself." *Ibid.* In *State v. Postorino,* 253 *N.J.Super.* 98, 107, 601 *A.*2d 223 (App.Div. 1991), the court observed that with knowledge of the true identity of a witness the defense could impeach the credibility of that witness in way other than simply the use of a criminal record, citing *Evidence Rules* 20 (regarding extrinsic evidence), 22 (regarding prior statements and character evidence), and 47 (regarding opinion or reputation testimony and character evidence).

That defendants had some information bearing on credibility did not obviate the need for information that could be derived from knowledge of Copola's true identity. As the Appellate Division pointed out, credibility was a significant issue in the case and therefore "identification of the informer's true name and address is essential to a proper exercise of the right to cross-examination of the prosecution's key witness." 261 *N.J.Super.* at 25, 617 *A.*2d 670. Copola's credibility was pivotal. The primary evidence of the illegal drug purchase was founded on his testimony. That evidence, on which the State relied, is the only evidence that directly contradicts defendants' version of the events. The credibility of the informant thus bears materially on the basic question of whether the crime was committed and on the affirmative defenses of statutory and due process entrapment.

The trial court also found that the potential harm to the informant and his family that would occur as a result of the

disclosure of his identity outweighed any defense need for that disclosure. 248 *N.J.Super.* at 63, 589 *A.2d* 1382. That finding was based on Copola's certification alleging that his life and the lives of his family were in danger and that therefore the State should not disclose his true identity, address, or facial features. Based on that certification the prosecutor had made a pretrial motion to allow Copola to testify with a hood to cover his face. The trial court denied that motion, even though it refused to require the State to reveal the informant's true identity.

■ A court should examine critically the claim of harm to the safety of an informant based on revelation of the identity of the informant. *See, e.g., Postorino, supra,* 253 *N.J.Super.* at 100–01, 601 *A.2d* 223 (questioning informer's claim of threat to safety where informer refused to participate in federal witness protection program). However, even if the safety of the informant would be imperiled by the disclosure of his true identity, that fact cannot surmount the imperative for trial fairness when disclosure is material to the defense and to a balanced presentation of essential issues. Concededly, informants are an important, indeed indispensable, part of the arsenal that law-enforcement forces bring to bear against drug crimes. But law enforcement agents, including retained outsiders who operate under the mantle of government and are authorized to take major initiatives in the investigation and the apprehension of suspected criminals, must function within the framework of the constitutional constraints governing criminal prosecutions. As aptly observed by the Appellate Division, because he was regularly-used and well-paid, "no reason [existed] why Capola should be treated any differently [from] a police officer who works undercover in drug trafficking as an agent of the government." 261 *N.J.Super.* at 26, 617 *A.2d* 670.

The State devised the reverse-sting involving the use of an informant to set up the illegal sale of drugs. In prosecuting the matter, it thus created the hard choice put to the court of either jeopardizing the safety of the State's informant or undermining defendants' constitutional right to a fair trial. The State cannot

create such a dichotomous dilemma and reasonably expect that courts will favor its interests on that issue at the expense of a defendant's rights. We conclude, as did the Appellate Division, that "defendant's constitutional right to a proper confrontation may not be sacrificed for the safety of a highly paid informer who is an active participant in the crime, rather than merely a tipster, and who testifies as the State's primary witness." *Ibid.*

Under the principles established by both the United States Supreme Court and this Court, the defense demonstrated the necessity for the disclosure of the true identity of the primary informant.

### III

Defendants claimed that they had been entrapped into committing the crimes for which they were prosecuted. They argue that they were entitled to the affirmative defense of entrapment on both statutory and constitutional grounds.

The trial court submitted to the jury the issue of statutory entrapment. It also ruled that due process entrapment presented a question of law to be resolved by the court, despite defendants' request to submit that issue to the jury. Nevertheless, the court concluded that the record did not establish due process entrapment. The Appellate Division determined that the trial court erred in failing to submit the issue of due process entrapment to the jury. 261 *N.J.Super.* at 28, 617 *A.*2d 670.

Under the Code of Criminal Justice, entrapment is an affirmative defense, which the defendant must prove by a preponderance of the evidence. *State v. Gibbons,* 105 *N.J.* 67, 519 *A.*2d 350 (1987); *State v. Medina,* 201 *N.J.Super.* 565, 493 *A.*2d 623 (App.Div.), *certif. denied,* 102 *N.J.* 298, 508 *A.*2d 185 (1985). The statutory defense has both subjective and objective elements. *State v. Rockholt,* 96 *N.J.* 570, 579, 476 *A.*2d 1236 (1984). Subjective entrapment occurs when the police implant a criminal plan into the mind of an innocent person who would not ordinarily have

committed the offense. *Id.* at 576, 476 *A.*2d 1236. Objective entrapment takes place when the police conduct causes an average citizen to commit a crime or when the conduct is so egregious as to "impugn the integrity of the court that permits a conviction." *State v. Fogarty,* 128 *N.J.* 59, 65, 607 *A.*2d 624 (1992). The statutory entrapment defense based on both subjective and objective elements is an issue that the jury must determine. *Rockholt, supra,* 96 *N.J.* at 577, 476 *A.*2d 1236; *see Delguidice v. New Jersey Racing Com'n.,* 100 *N.J.* 79, 83, 494 *A.*2d 1007 (1985).

Entrapment based on constitutional due process principles concentrates exclusively on government conduct and the extent of the government's involvement in commission of the crime. *State v. Johnson,* 127 *N.J.* 458, 470, 606 *A.*2d 315 (1992). Due process entrapment poses an issue of law that must be resolved by the court. *See State v. Talbot,* 71 *N.J.* 160, 168, 364 *A.*2d 9 (1976). Further, due process entrapment may be found even though a defendant fails to establish statutory entrapment. *See Johnson, supra,* 127 *N.J.* at 467, 469, 606 *A.*2d 315.

Under due process standards, entrapment occurs when the governmental conduct was "patently wrongful in that it constitutes an abuse of lawful power, perverts the proper role of government, and offends principles of fundamental fairness." *Id.* at 473, 606 *A.*2d 315. A determination of due process entrapment requires careful scrutiny of the government conduct in light of all the surrounding circumstances. That scrutiny focuses on:

(1)`whether the government or the defendant was primarily responsible for creating and planning the crime, (2) whether the government or the defendant primarily controlled and directed the commission of the crime, (3) whether objectively viewed the methods used by the government to involve the defendant in the commission of the crime were unreasonable, and (4) whether the government had a legitimate law enforcement purpose in bringing about the crime.

[*Id.* at 474, 606 *A.*2d 315.]

We conclude that neither the record before us nor the trial court's factual findings informs us sufficiently whether the

State's actions constituted due process entrapment under those standards.

The first factor in *Johnson* involves "whether the government or the defendant was primarily responsible for creating and planning the crime." *Ibid.* In *Johnson*, the defendant authored the basic idea of the crime, and when the police presented him with a specific criminal plan to implement his idea, the defendant embellished the scheme with additional details of his own. The record here strongly suggests that the government, not defendants, was responsible for devising, creating, and planning the reverse-sting drug transaction in question. The solicited crime involved the use of a confidential informant, who would pose as a large-scale distributor of cocaine. When someone was interested in purchasing cocaine, Copola, that informant, would communicate with Captain Scott Fabiano of the Somerset County Prosecutor's Office Narcotics Strike force. A "reverse-sting" operation would then be attempted whereby Copola would lure the person or persons interested in the purchase of cocaine to an arranged location within Somerset County where waiting law-enforcement officers would arrest the suspect when they attempted to complete the transaction. 261 *N.J.Super.* at 16–17, 617 *A.*2d 670. Copola had engaged in such drug operations at least a dozen times. That scheme was used by the State's agents to implicate defendants. Conversely, the record contains no evidence that defendants had ever before engaged in such crimes or in any way contributed to the creation and planning of the criminal scheme that resulted in their apprehension.

The second factor focuses on "whether the government or the defendant primarily controlled and directed the commission of the crime." *Johnson, supra,* 127 *N.J.* at 474, 606 *A.*2d 315. The record points to the fact that the State controlled and directed defendants in the commission of the crimes. The informants selected defendants as the targets for the reverse-sting. The informants, in cooperation with law-enforcement officers, arranged the drug transaction with defendants. Further, the effectuation of

the plan for the drug purchase appears to have been managed and directed by the informants and the law-enforcement officers.

The third factor in *Johnson* requires a court to determine "whether objectively viewed the methods used by the government to involve the defendant in the commission of the crime were unreasonable." *Ibid.* "The nature of the efforts directed to encourage defendants to commit the crime is another measure of the propriety of government conduct." *Id.* at 478, 606 *A.*2d 315. As we pointed out in *Johnson*, "[t]actics like heavy-handed pressure; repetitive and persistent solicitation, or threats or other forms of coercion; the use of false and deceitful appeals to such humanitarian instincts as sympathy, friendship, and personal need; and the promise of exorbitant gain are generally disallowed because they can overwhelm the resistance of ordinary people." *Ibid.* Several aspects of this case are relevant under that criterion. The transaction planned by the police clearly involved the inducement of an "exorbitant gain." The State's drug expert testified that when the substance was diluted and sold to street users, a dealer would realize about $90,000 per kilogram. Thus, with a $16,000 investment, a dealer could earn a gross profit of $74,000.

In addition, the use of a contingent-fee arrangement as a means of compensating Copola created a number of perverse incentives, generating a real risk that innocent persons would be pressured into the commission of crimes. At the time of defendants' arrest, Copola had been working for the Somerset County Prosecutor's Office in the capacity of a confidential informant for approximately eighteen months. The prosecutor's office paid Copola a percentage of any monies that were confiscated as a result of drug purchases arranged by him. · The office would pay him ten percent of the first $100,000 involved in any transaction and fifteen percent of any amount over $100,000. In this case, Copola was paid in excess of that rate—he received close to $1,700 for a $16,000 drug sale. By the time Copola testified at defendants' trial, he had been involved in thirteen "reverse buys" for which the State had

paid him approximately $130,000. 261 *N.J.Super.* at 17, 617 *A.*2d 670.

Not only is the contingency arrangement a powerful incentive for the informant to pressure or coerce persons into the commission of crime, it constitutes a potent influence to fabricate or exaggerate testimony to establish the guilt of a defendant. As Copola admitted on cross-examination, he recognized that as part of his job as a paid informant he was expected to testify at trial. To continue his highly profitable arrangement, Copola needed to meet the expectations of the prosecutor's office.

In *State v. Glosson*, 462 *So.*2d 1082 (1985), the Florida Supreme Court determined that an agreement to pay an informant a contingent fee conditioned on his cooperation and testimony in criminal prosecutions violated the constitutional due process rights of the defendants. The court in *Glosson* commented that "[w]e can imagine few situations with more potential for abuse of a defendant's due process right." *Id.* at 1085.

Also relevant to determining whether the methods used to implicate defendants were objectively unreasonable is the apparent lack of supervision over the informants by the prosecutor. In that regard, the actual circumstances under which the informant initially "selected" and communicated with defendants are hazy. De La Roche apparently had been targeted as a potential drug purchaser in a reverse-sting transaction orchestrated by Copola. As a result of De la Roche's arrest, on January 2, 1990, he agreed to cooperate as a confidential informant in exchange for leniency. Two days later, De la Roche provided Copola with the name of Alex Florez. Thus the initial selection of Florez, and consequently Garcia, was attributable to De La Roche and Copola. 261 *N.J.Super.* at 17–18, 617 *A.*2d 670.

The police should ordinarily have a reasonable suspicion that the targeted defendant would be likely to engage in the commission of the crime contemplated. Even the United States Supreme Court, which has primarily maintained a subjective approach to entrapment, requires reasonable suspicion of a person before that

person becomes the focus of an investigation. *Jacobson v. United States*, —— *U.S.* ——, ——, 112 *S.Ct.* 1535, 1543, 118 *L.Ed.*2d 174, 184 (1992). The circumstances of this case are in sharp contrast to those in *Johnson, supra,* where the defendant himself

> initiated the chain of events that eventuated in the criminal acts ... [and his] position as a police officer with regular involvement in the drug world, coupled with his ongoing drug use and his expressed desire to commit a more serious drug offense, created a sufficient likelihood that the desire would become the deed, even without government intrusion.

[127 *N.J.* at 477, 606 *A.*2d 315.]

In this case neither of the defendants had a previous criminal record, and they testified that they had not engaged in a drug transaction. Apparently the police targeted them only on the say-so of unsupervised informants, without any indication of a basis for a reasonable suspicion that defendants were likely to engage in such criminal acts.

Another factor relevant to the inquiry into the State's tactics is whether the money used to buy the drugs in this case was supplied by De La Roche. *Compare Johnson, supra,* 127 *N.J.* at 482, 606 *A.*2d 315 (indicating full-circle transaction is not *per se* a violation of due process entrapment) *with Talbot, supra,* 71 *N.J.* at 168, 364 *A.*2d 9 (finding full-circle reverse sting would unreasonably violate principles of fundamental fairness). The trial court reasonably sought to establish whether the State had supplied the money used by defendants to purchase the drugs. The court satisfied itself through the jury's answer to a special interrogatory that the State had not furnished the drug-purchase money. That finding, however, cannot be used in light of our reversal of the defendants' conviction. That factual issue, therefore, remains to be resolved. If the State did not supply the money for the purchase of drugs, that circumstance alone would not be dispositive of whether due process entrapment had occurred. However, if the State supplied the money that was used to purchase the drugs, the actions of the government under all the surrounding circumstances could hardly be characterized as anything other than egregious and unreasonable.

The fourth prong of the *Johnson* test is "whether the government had a legitimate law enforcement purpose in bringing about the crime." 127 *N.J.* at 474, 606 *A.*2d 315. We readily acknowledge that "[s]pecial efforts may be required to cope with the difficulties of investigating drug offenses." *Id.* at 480, 606 *A.*2d 315. We can appreciate the great difficulty in effectively investigating and apprehending mid-level drug dealers. Drug dealers who function at higher organizational levels of a criminal enterprise clearly trigger greater public concerns, necessarily invite more vigorous and intensive law-enforcement measures, and justly deserve harsher treatment at the hands of the criminal laws. *See, e.g., State v. Afanador,* 134 *N.J.* 162, 169, 631 *A.*2d 946 (1993). We can easily recognize that a reverse sting—used to expose and apprehend such persons—may be a very effective weapon in society's war against drug crimes. Nonetheless, the record does not reveal why the specific *modus operandi* used by the State in this case was indispensable to the accomplishment of its law-enforcement goals. The record thus does not disclose why the reverse-sting operation could not have been used successfully without a contingency-compensation arrangement with the primary informant or without more effective control and supervision over the informant by law-enforcement officers or without other safeguards and precautions that would reduce the risk that an innocent person would be coerced into the commission of crime.

The evidence in this record is not sufficient to permit us to resolve the issue of due process entrapment. Further, the trial court, in determining, correctly, that the court was to decide this issue as a matter of law, did not have available the standards set forth in *Johnson.* Because this case must be retried on other grounds, the trial court should make that determination based on those standards informed by an adequate record. On retrial, the parties will have an opportunity to amplify the record as it bears on the determination of whether due process entrapment occurred.

■ Statutory entrapment, as earlier noted, is an affirmative defense to be determined by the jury, and with respect to which the burden of proof is on the defendants. *See Rockholt, supra,* 96 *N.J.* at 577, 476 *A.*2d 1236. The focus of due process entrapment, as opposed to statutory entrapment, is exclusively on the actions of the State. That circumstance justifies a different allocation of the burden of proof from that required by statutory entrapment. Because in the context of due process entrapment the prosecution has created the situation that is under scrutiny and because the State has far more control over the evidence relevant to proving or disproving due process entrapment, we are convinced that the burden of proof must lie with the State. That conclusion is consistent with the approach taken by the Court in *Talbot, supra,* 71 *N.J.* at 165, 364 *A.*2d 9, a pre-statute case, which provided the basis for the development of due process entrapment. *See Johnson, supra,* 127 *N.J.* at 469, 606 *A.*2d 315.

Although the question of the burden of proof relating to entrapment was not fully answered in *Talbot,* see *Rockholt, supra,* 96 *N.J.* at 576 n. 2, 476 *A.*2d 1236, we determine, as indicated by *Talbot,* that defendant must initially put forth some evidence of due process entrapment before the burden switches to the State. Although "[a] defendant who claims entrapment has the burden of presenting evidence in support of this defense, ... once this is done, ... the State must prove" that entrapment has not occurred. *Talbot, supra,* 71 *N.J.* at 165, 364 *A.*2d 9. That approach is consistent with the one taken in respect of other affirmative defenses in connection with which the State bears the ultimate burden of proof. *E.g., State v. Galloway,* 133 *N.J.* 631, 628 *A.*2d 735 (1993) (dealing with evidence relating to affirmative defense of diminished capacity).

Further, we determine that the State must disprove due process entrapment by "clear-and-convincing" evidence. Because due process entrapment typically involves situations engineered by law-enforcement officials, placing that level of burden on the State is reasonable. In other contexts in which evidence has been ob-

tained illegally, this Court has found the same level of burden to be appropriate. *See State v. Sugar*, 100 *N.J.* 214, 239, 495 *A.*2d 90 (1985) (applying "clear-and-convincing-evidence" standard as elevated burden of proof with respect to claim of "inevitable discovery" of illegally obtained evidence, because State had "created [the] situation"). The same considerations impel us to adopt the "clear-and-convincing" standard for cases involving the due process entrapment defense. An even higher burden, "beyond a reasonable doubt," is placed on the State when the voluntariness of suspect's confession is at issue. *E.g., State v. Gerald*, 113 *N.J.* 40, 118, 549 *A.*2d 792 (1988) (stating "In New Jersey . . . we have long adhered to the view that as a matter of state law, the waiver [of one's right to remain silent] must be proven beyond a reasonable doubt."). Such a high burden is required when evaluating confessions largely because the State is usually in control of the environment in which confessions occur. *E.g., State v. Reed*, 133 *N.J.* 237, 259–60, 627 *A.*2d 630 (1993) (finding that inherently coercive atmosphere of custodial interrogation was exacerbated by refusal to permit access by retained attorney who was present to speak with suspect). The same logic suggests the use of a high burden when the due process entrapment defense is legitimately invoked because the State similarly controls the environment. We refrain, however, from imposing the highest standard of proof as is done in confession-cases because the issue of due process entrapment lacks an additional concern attendant to the confession-cases, namely, the questionable evidentiary reliability of a confession that is not objectively and definitively voluntary. *Id.* at 260, 627 *A.*2d 630.

Finally, we note that in addressing the issue of due process entrapment, the trial court should rely on the evidence presented during the course of the trial and any additional hearings that might be necessary to provide the proper factual basis to make that determination. That approach should obviate the use of special interrogatories to be answered by the jury.

## IV

In the course of ongoing pre-trial motions, the prosecutor took the position that Copola was the only informer involved in the transaction. Not until the second day of the trial did the State disclose for the first time that De La Roche had been a retained informant. Although defendants knew of De La Roche's involvement in the crime, they did not know prior to that disclosure that he had been an informer.

Defendants argue that De La Roche played a central role because he selected and targeted defendants and set up the entire transaction and actually provided the money. The trial court, however, relying on the prosecutor's representation, believed that De La Roche "was not a participant in the actual transaction ... between ... [d]efendants and the police officers at the time of the arrest."

The record supports defendants' contention that De La Roche was not a marginal participant in the crime. He apparently played a substantial part in arranging for the commission of the crimes. De La Roche was intimately familiar with Copola's scheme of the reverse-sting against suspected mid-level drug dealers, having been arrested in a case in which Copola had been the State's main operative. De La Roche himself singled out Florez as the target of the sting; he was the person who introduced Copola to defendants. In addition, he attended all the meetings between defendants and Copola at which the criminal plan was devised. Finally, he was present when the drug transaction occurred. 261 *N.J.Super.* at 17–19, 617 *A.*2d 670. In light of all these circumstances, the Appellate Division correctly found that a substantial issue of entrapment existed, and concluded "that the prosecutor delayed for an unreasonable period of time in supplying information that De La Roche was a participant in the criminal event." *Id.* at 28, 617 *A.*2d 670.

*Brady v. Maryland,* 373 *U.S.* 83, 83 *S.Ct.* 1194, 10 *L.Ed.*2d 215 (1963), requires the prosecution to disclose evidence in its

possession that is both material and favorable to the defendant. Evidence is material "only if there is a reasonable probability that, had it been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 *U.S.* 667, 682, 105 *S.Ct.* 3375, 3383, 87 *L.Ed.*2d 481, 494 (1985). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Ibid.* "Where the defendant has made a specific request for information and the prosecution has failed to reveal the requested information, the standard of materiality is whether 'the suppressed evidence might have affected the outcome of the trial.'" *State v. Carter*, 91 *N.J.* 86, 112, 449 *A.*2d 1280 (1982) (quoting *United States v. Agurs*, 427 *U.S.* 97, 104, 96 *S.Ct.* 2392, 2398, 49 *L.Ed.*2d 342, 350 (1976)).

De La Roche could have provided information that would have had a direct bearing on Copola's testimony relating to the commission of the crime. That information also would have been relevant to the issue of entrapment. Because of De La Roche's role in the reverse-sting, defendants were entitled to know long before the second day of trial that he had been a retained informer.

The State contends, however, that it should be excused from its failure to provide such discovery because it made reasonable efforts to locate De La Roche and defendants already knew De La Roche's identity. The trial court found that the State had done enough to attempt to locate De La Roche and further that the failure to reveal his identity as an informant had not prejudiced the defense. The State apparently had checked De La Roche's last-known address, pager number, and phone number. The defense itself searched through inmate-identification procedures and interviewed neighbors.

When the defendants know the identity of the informant and that his or her testimony may be relevant to an entrapment defense, courts have found that the government must nevertheless make a reasonable effort to locate the informant and produce him or her at trial. *See, e.g., United States v. Suarez*, 939 *F.*2d 929, 932 (11th Cir.1991) (citing *Roviaro, supra*, 353 *U.S.* at 60–61, 77

*S.Ct.* at 627–28, 1 *L.Ed.*2d at 645). A defendant's unsuccessful efforts do not excuse the State from its responsibility to ferret out and produce information that is important to the defense and to which it is entitled.

We agree with the Appellate Division, 261 *N.J.Super.* at 28, 617 *A.*2d 670, that the State under the circumstances did not satisfy its obligation of discovery owed the defense. However, in light of the decision to remand this case and the fact that De La Roche's status as an informant is now disclosed as a matter of record, we need not further consider the issue of prejudice as a result of the State's breach of defendants' discovery rights.

## V

As a final point, both defendants now claim that the trial court failed to charge the jury that the weight of the cocaine was an essential element of the underlying offense of possession with intent to distribute and that that omission constituted reversible error.

Defendants were charged with and convicted of second-degree conspiracy to commit the crime of possession of a controlled substance with intent to distribute, a crime of the first degree. *N.J.S.A.* 2C:35–5b(1) (first-degree possession with intent to distribute) and *N.J.S.A.* 2C:5–4a. (grading of conspiracy). The statute, *N.J.S.A.* 2C:35–5b(1), specifies that that crime requires possession of a substance in a quantity of five ounces or more. When instructing the jury on the elements of that crime, the trial court explained the concept of conspiracy and then explained the elements of possession of cocaine with intent to distribute. In its description of the elements of possession of cocaine with intent to distribute, the trial court never instructed the jurors that the weight of the cocaine was an element of the crime and that they were required to determine that element.

Neither defendant raised an objection to the jury instructions and to the omission of a reference to the weight of the controlled dangerous substances as an element of the crime charged. Gar-

cia, however, raised that issue in his motion for direct certification. Florez did not raise that issue in his appeal to the Appellate Division. He raised the issue only through a cross-petition for certification following Garcia's motion for direct certification.

We would not ordinarily entertain an issue presented in the foregoing fashion. However, the State has acknowledged that the weight of the controlled dangerous substance is a material element of the crime of first degree possession with intent to distribute under *N.J.S.A.* 2C:35-5b(1). Further, the State conceded that the trial court's failure to instruct the jury on the weight of the cocaine as an element requires reversal of the second-degree conspiracy conviction. Those positions would appear to be correct. *See, e.g., State v. Roberson,* 246 *N.J.Super.* 597, 607, 588 *A.*2d 434 (App.Div.1991) (holding that failure to charge jury properly on weight of controlled substance as element of crime must result in reversal even where not objected to and where State's evidence on weight was uncontradicted). The State maintained, however, that the proper remedy was resentencing for the lesser-included offense of conspiracy to commit third-degree possession with intent to distribute. We need not consider further the State's proposed remedial relief in light of our reversal of the convictions.

However, in view of the State's position on the merits, we address the issue. Accordingly, we conclude that when this case is retried, the trial court should instruct the jury on the weight of the cocaine as an element of the crime charged.

## VI

In *State v. Florez,* we uphold the Appellate Division's reversal of defendant's conviction and remand for retrial. In *State v. Garcia,* we reverse the conviction entered by the Law Division and remand for retrial.

*For affirmance and remandment in State v. Florez*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.

*For reversal and remandment in State v. Garcia*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.