725 A.2d 707

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. BRYAN GRUBB, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued February 1, 1999—Decided March 19, 1999.

408

Before Judges HAVEY, PAUL G. LEVY and LESEMANN.

*Francis J. Hartman* argued the cause for appellant (*Hartman & Zamost*, attorneys; *Deirdre K. Hartman*, on the brief).

*Linda K. Danielson*, Deputy Attorney General, argued the cause for respondent (*Peter Verniero*, Attorney General, attorney; *Ms. Danielson*, of counsel and on the brief).

The opinion of the court was delivered by

PAUL G. LEVY, J.A.D.

Defendant, a municipal police officer, appeals from his conviction on charges of conspiracy to possess a controlled dangerous substance, the steroid stanozolol, possession of the steroid testosterone, and official misconduct. The record makes it clear that the State engaged in activities that rose to the level of common law due process entrapment. We conclude that the trial court erroneously denied defendant's motion for acquittal, and we reverse his conviction and enter a judgment of acquittal. Therefore we need not discuss defendant's other contentions on appeal.

In denying defendant's motion for acquittal, the trial court mistakenly required defendant to prove the defense of due process entrapment by a preponderance of the evidence. Instead, the State should have been required to disprove entrapment by clear and convincing evidence, and it would have been unable to do so. Defendant's due process entrapment arose in an atypical circum-

stance where the improper methods of the police stem from their lack of supervision over the informant, rather than the use of heavy-handed tactics; and from their instigation of a sting operation based on their misapprehension, which continued until after defendant's arrest, that the drug defendant agreed to sell to the informant was illegal. In light of this scenario and in conjunction with the other circumstances of this case, the State is unable to meet its burden.

On March 13, 1995, Vincent Zarlenga was arrested as a result of an ongoing "steroid investigation" conducted by the Edison Police Department and the Narcotics Task Force of the Middlesex County Prosecutor's Office. Zarlenga was charged with distributing steroids, a controlled dangerous substance. When Zarlenga was arrested, he offered to cooperate with the police. Zarlenga was debriefed by Steven Weitz, a police investigator with the task force. He told Weitz that defendant was a police officer with whom he "had a deal pending at that time." According to Zarlenga, the potential deal involved his sale to defendant of ten ampules of stanozol [1] in exchange for defendant providing Clenbuterol, an asthma medication that reduced body fat; Aldactazide, a diuretic; and cash. The deal had been initiated two weeks prior to Zarlenga's arrest.

Zarlenga telephoned defendant from the police station on the night of March 13, and they spoke only about items Zarlenga was going to receive from defendant.[2] No attempt was made to record

---

[1] Although Stanozol is a trade name for stanozolol, throughout the record the two names are used interchangeably, along with Winstrol and Winstrol V.

[2] It is clear from the record that the police believed during the entire operation prior to defendant's arrest they were targeting defendant as an individual who was distributing steroids. In the March 13 conversation between Zarlenga and defendant, they discussed Clenbuterol, but no steroids. Weitz's misapprehension of Clenbuterol as a steroid "confirmed" Zarlenga's allegations and triggered the entire subsequent operation. Weitz admitted that, at the time of that conversation and continuing until *after* defendant's arrest, he believed that Clenbuterol was an illegal steroid. Thus, the "verification" that defendant was engaged in

the conversation. Weitz was standing beside Zarlenga, and Zarlenga told him what defendant said during the conversation. Zarlenga continued to telephone defendant after March 13, and he received messages on his answering machine from defendant. None of those conversations or attempts were recorded. The police never told Zarlenga to refrain from calling defendant outside their presence or in the absence of a recording device. The police never requested copies of the tapes from Zarlenga's answering machine, nor did they request his telephone records.

In a formal taped statement, Zarlenga told Weitz that he had known defendant for two years, having met him through a man named Prince Brown. Brown had introduced Zarlenga to defendant so Zarlenga could buy and sell steroids with him. Zarlenga purchased steroids from defendant on ten occasions and also sold defendant steroids. Zarlenga would contact defendant by telephone and they would arrange to meet at the Middlesex Diner in North Brunswick, though defendant often sent Brown to make the transactions.

On March 17, 1995, the prosecutor approved a "consensual intercept" for a period of five days to allow taping conversations between Zarlenga and defendant on defendant's telephone line. During the next ten days, Zarlenga either spoke with defendant by telephone or left him messages on four occasions. In all of the conversations, defendant was equivocal at most; it was Zarlenga who described the prescription drugs and steroids which were part of the deals between Zarlenga and defendant. Most importantly, the State let Zarlenga proceed without controlling his conduct. Inexplicably, most of the conversations between Zarlenga and defendant were not intercepted and recorded. Thus, Zarlenga was given the opportunity to fabricate, without chal-

the purchase and sale of illegal steroids arose from the lead investigator's insufficient knowledge of illegal drugs and mistaken impression that defendant had agreed to sell Zarlenga an illegal substance.

lenge, the statements defendant allegedly made in furtherance of the conspiracy between the two.

On March 28, Weitz confirmed with Zarlenga the time and date for a meeting and met with his supervisor and other officers to establish a plan. Also on March 28, Weitz provided Zarlenga with stanozol obtained from the police evidence locker pursuant to court order, which Zarlenga placed in a small gym bag inside the trunk of his car. He also was equipped with a pager listening device capable of transmitting his conversation to a remote location.

Zarlenga then proceeded to the Middlesex Diner and parked his car in the back, arriving at 4:00 p.m. Twelve law enforcement officers were on the scene, communicating via radio on a confidential frequency reserved for the task force. But while Zarlenga was waiting in the parking lot, the officers discovered that the listening device was not working and therefore they would be unable to hear his conversations.

Weitz observed a vehicle registered to defendant approaching Zarlenga. Defendant's vehicle passed very slowly within a few feet of Zarlenga's but it did not stop. Weitz observed that no communication took place between the two cars. After defendant's vehicle was parked, Weitz observed Zarlenga approach the vehicle, kneel next to it and show his bag to the person in the back seat. The encounter lasted about a minute, and Zarlenga returned to his own car. Zarlenga had never removed the steroids from his bag. Defendant's vehicle drove away from the diner.

Zarlenga then told the officers that he had asked defendant what was going on, and defendant had replied that he was nervous and wanted to move to another location. According to Zarlenga, defendant told him to follow him. The men did not discuss the steroids and Zarlenga did not indicate to the officers that they had. Nor did he make any statement to the officers indicating that he had seen drugs in the car, or that defendant had drugs in the car. Lt. Krisza, the Deputy Commander of the task force, was responsible for determining if an arrest would be made. He

testified that immediately after Zarlenga's encounter with defendant in the parking lot Zarlenga told him that "everything was okay; however, [defendant] felt uncomfortable to do the deal at that particular location and wanted to do the deal down the road." Krisza concluded that probable cause to arrest existed and he ordered the others to arrest defendant. Defendant's vehicle was followed to a shopping center, and after it was parked, the officers effected the arrest.

The defense of entrapment may be interposed when a defendant "introduces evidence of the government's involvement in the crime through initiation, solicitation, or active participation." *State v. Johnson*, 127 *N.J.* 458, 464, 606 *A.*2d 315 (1992). There are two kinds of entrapment defenses. The first is a codified affirmative defense, to be determined by a jury, and the burden of proof for establishing the defense rests with the defendant. *State v. Florez*, 134 *N.J.* 570, 590, 636 *A.*2d 1040 (1994); *N.J.S.A.* 2C:2-12. "Statutory entrapment," as this defense is known, requires that the defendant establish that he had no predisposition to commit the crime. *Id.* at 583–84, 636 *A.*2d 1040. Therefore, "[t]he defense will fail if the defendant was ready and willing to commit the crime." *State v. Johnson, supra,* 127 *N.J.* at 464, 606 *A.*2d 315.

In addition to the statutory defense, an accused retains the right to invoke a separate due process entrapment defense founded on the New Jersey Constitution. *Id.* at 473, 606 *A.*2d 315. This constitutional defense may survive even when a defendant fails to establish statutory entrapment. *State v. Florez, supra,* 134 *N.J.* at 584–91, 636 *A.*2d 1040. In contrast to statutory entrapment, a determination of due process entrapment focuses "exclusively" on the State's conduct and the extent of its involvement in the crime, and not merely on whether that conduct induced or caused the crime. *Id.* at 584, 636 *A.*2d 1040. In determining whether a defendant has established due process entrapment, the court's scrutiny must focus on:

(1) whether the government or the defendant was primarily responsible for creating and planning the crime, (2) whether the government or the defendant primarily controlled and directed the commission of the crime, (3) whether objectively viewed the methods used by the government to involve the defendant in the commission of the crime were unreasonable, and (4) whether the government had a legitimate law enforcement purpose in bringing about the crime.

[*State v. Johnson, supra*, 127 *N.J.* at 474, 606 *A.*2d 315.]

Unlike statutory entrapment, the determination of due process entrapment is a matter of law to be decided by a court. *State v. Florez, supra*, 134 *N.J.* at 584, 636 *A.*2d 1040. Furthermore, the allocation of proof is different from that required in a determination of statutory entrapment. *Id.* at 590, 636 *A.*2d 1040. "Because in the context of due process entrapment the prosecution has created the situation that is under scrutiny and because the State has far more control over the evidence relevant to proving or disproving due process entrapment," the Supreme Court determined that "the burden of proof must lie with the State." *Ibid.* Moreover, "the State must disprove due process entrapment by 'clear and convincing' evidence." *Ibid.* Thus, once a defendant has put evidence of due process entrapment before the court, the State has the burden of proving by clear and convincing evidence that entrapment has not occurred. *Ibid.*

Here, the two kinds of entrapment defenses were confused. Defendant made no request that the court instruct the jury on entrapment. Therefore, the only issue before the trial court was whether the circumstances established due process entrapment as a matter of law. Yet the trial court allocated the burden of proof to defendant, rather than requiring the State to disprove entrapment. Prior to hearing argument on the issue, the court observed incorrectly that due process entrapment was "an affirmative defense [defendant] must prove by a preponderance of the evidence." At trial, neither attorney challenged the court's mistaken assumption. However, we conclude that decision amounts to plain error because the court's mis-allocation of the burden of proof had the clear capacity to bring about an unjust result in this case. *R.* 2:10–2.

■    Rather than requiring the State to disprove entrapment by clear and convincing evidence, the court's analysis in effect provided the State with every possible favorable inference.[3]   In its findings regarding the first *Johnson* factor, the court stated that "one could reasonably believe that it was not the government who was primarily responsible for creating and planning the crime" because "[i]t is well known that silence gives consent" and "[i]t was clear that [defendant's] silence gave his consent" during the phone conversation with Zarlenga.   Then it concluded that defendant primarily controlled and created the commission of the crime because "ultimately it was the defendant who chose to come there. It was the defendant who chose the time he was off work.   It was defendant who put his wife and child in the car and arranged to be there at three o'clock."   The court cited the State's efforts to corroborate the informant's information and obtain a consensual intercept and the officers' presence during the exchange as evidence that the State's methods were reasonable.   Finally, the court found that the State had "painstakingly investigated" the allegations and would have been criticized if it had turned its back on the information.   Consequently, the court concluded that the State had fulfilled the fourth factor and had a legitimate reason for "bringing about" the crime.   Nowhere in the court's decision does it place the burden of proof upon the State.

■    In light of the *Johnson* factors and the proper burden of proof, we conclude that the State cannot disprove by clear and convincing evidence that defendant was entrapped.   Evaluation of the *Johnson* factors centers around "two major recurrent concerns: the justification for the police in targeting and investigating the defendant as a criminal suspect;  and the nature and extent of

---

[3] In addition to citing the standard for statutory entrapment, the court may have been led to apply an erroneous standard because it also stated that it "suppose[d]" defendant's motion was one for a "judgment of acquittal."   In determining a motion for judgment of acquittal based on insufficient evidence, the State is entitled to the benefit of all testimony favorable to it and all favorable inferences to be drawn from that testimony.   *State v. Reyes*, 50 *N.J.* 454, 458–59, 236 *A.2d* 385 (1967).

the government's actual involvement in bringing about the crime." *State v. Johnson, supra,* 127 *N.J.* at 474–75, 606 *A.*2d 315. In targeting a defendant, the police should have a "reasonable suspicion" that he was participating in prior similar criminal activity. *Id.* at 475–76, 606 *A.*2d 315. In this case, defendant had no prior record of any criminal activity. Furthermore, Zarlenga initially provided the police with only vague information indicating that defendant had purchased steroids illegally. For example, at the pretrial hearing, Weitz testified that Zarlenga provided only "[v]ery general" information concerning his sale of steroids to defendant. Weitz could not even recall asking Zarlenga about the specific substances involved. While Zarlenga also alleged that he had a deal pending with defendant, the police never attempted to contact Brown to confirm Zarlenga's story.

As to the second of *Johnson*'s two major concerns, the State's involvement in bringing about the crime, in this case it is the State's lack of supervision that is troubling. Even after the police had contact with Zarlenga, with the exception of one taped telephone call, all of the planning and conversations allegedly involving that transaction took place outside the presence of the police. Ineffective control and supervision of an informant by law enforcement increases the risk that an innocent person will be coerced into committing a crime. *State v. Florez, supra,* 134 *N.J.* at 589, 636 *A.*2d 1040. Moreover, it places the informant in a position to characterize and even invent details concerning a targeted defendant's response to the informant's efforts. In this case, the lack of supervision and reliance on Zarlenga's word is particularly vexatious in light of Zarlenga's strong personal motivation to avoid "serious" jail time for a third conviction and, later, to effect defendant's arrest even though he was not seen to have purchased the steroids at the diner location. This reliance was compounded when the taping equipment malfunctioned during the meeting and detectives were compelled to accept Zarlenga's representation that defendant had agreed to the exchange, but merely wanted to change the location.

In addition to implicating the two underlying concerns expressed by the court in *Johnson*, Weitz's unrestricted authorization for Zarlenga to engage defendant in unmonitored telephone conversations directly relating to the deal impedes our ability to analyze several of the specific *Johnson* factors. Zarlenga's repeated, unmonitored contacts with defendant make it difficult to ascertain whether Zarlenga or defendant was "primarily responsible" for either creating and planning the crime, the first factor, or controlling and directing the commission of the crime, the second factor. In the only recorded conversation between the men, it is clearly Zarlenga who insists on setting up a meeting, telling defendant that "we gotta get this over and done with though cause I gotta get that stuff." Defendant offered to mail the Clenbuterol and Cytomel.

Contrary to the court's findings, Zarlenga selected the day, time and location for the meeting, saying "let's shoot for Monday or Tuesday in the afternoon at the Middlesex Diner." Defendant made no suggestion as to the time or place of the meeting. Zarlenga explicitly testified that he chose those days which were most convenient for him. While defendant clearly agreed to supply Zarlenga with the Clenbuterol and Cytomel, he was far more equivocal about accepting the steroids offered.

The State's inadequate supervision of the informant in this case also impacts the third *Johnson* factor regarding the nature and reasonableness of the State's methods of involving defendant. Generally that factor requires evaluating whether the State employed "[t]actics like heavy-handed pressure; repetitive and persistent solicitation, or threats or other forms of coercion"; employed false and deceitful personal appeals to sympathy or friendship; or promised "exorbitant gain." *State v. Johnson, supra,* 127 *N.J.* at 478, 606 *A.*2d 315. Zarlenga telephoned defendant numerous times, but he was often unsuccessful and in the absence of any record of his additional conversations with defendant it is difficult to determine whether Zarlenga "badgered" defendant in any way. But it is also clear that, even in the

taped conversation, Zarlenga persisted in raising the issue of the steroids in the face of defendant's equivocal responses.

The tactics of the police lead us to conclude that the State did not carry its burden of proof. Those tactics include the police having initially targeted and then arrested defendant based on their own misapprehension of a drug's illegal status, and regardless of defendant's lack of a prior record; Zarlenga's failure or inability to provide the police with specific information concerning previous allegedly illegal transactions with defendant; the equivocal nature of the conversation on the sole taped recording between Zarlenga and defendant; the undisputed existence of an unknown number of additional, unmonitored telephone contacts between Zarlenga and defendant directly relating to the deal; the inability of the police to record the conversation between Zarlenga and defendant at the diner, which forced them to rely on Zarlenga's representation of defendant's response; and the undisputed fact that defendant drove away from that meeting without purchasing the steroids. Given this sequence of events, the State is unable to prove by clear and convincing evidence that defendant was not entrapped.

Therefore, we reverse the denial of defendant's motion for acquittal based on due process entrapment, vacate the judgment of conviction and enter a judgment of acquittal.